# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR RECUSAL

### NO. 03-05-00585-CR
### NO. 03-05-00586-CR

**Ex Parte James W. Ellis**

### NO. 03-05-00589-CR
### NO. 03-05-00590-CR
### NO. 03-05-00591-CR
### NO. 03-05-00592-CR
### NO. 03-05-00593-CR
### NO. 03-05-00594-CR
### NO. 03-05-00595-CR
### NO. 03-05-00596-CR
### NO. 03-05-00597-CR
### NO. 03-05-00598-CR
### NO. 03-05-00599-CR
### NO. 03-05-00600-CR
### NO. 03-05-00601-CR
### NO. 03-05-00602-CR
### NO. 03-05-00603-CR

**Ex parte John Dominick Colyandro**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NOS. D-1-DC-2005-904122, 9040564, 9040570, 9040571, 9040572, 9040573, 9040574, 9040575,
9040576, 9040577, 9040565, 9040566, 9040567, 9040568, 9040569, 9040598 & D1DC-05-904121,
HONORABLE BOB PERKINS, JUDGE PRESIDING**

**O P I N I O N**

Judges serve at the apex of the judicial system and are charged with the difficult task of settling disputes between two or more interested parties. Because these disputes often involve complex legal issues, it is in the State's best interest to fill the judiciary with individuals with extensive legal experience, and the constitution of this State recognizes that interest by requiring judges to have been engaged in the practice of law for several years before they may serve the State in a judicial capacity. This mandate is satisfied through years of practice as a lawyer in either the private or the public sector.

Once lawyers have been chosen to serve in a judicial capacity, their oath of office compels them to dispense justice in an impartial, unbiased, and dispassionate manner and to decide disputes based on the facts presented to them and on the dictates of the relevant law. This includes not letting emotion or personal beliefs serve as substitutes for sound judicial reasoning. Due to the solemnity of the oaths that judges take, they enjoy a presumption of being fair and disinterested. Moreover, once sworn, judges are obligated to preside over cases, even when they might prefer otherwise, unless there is a legitimate basis upon which the judge should step down. That obligation is no doubt imposed, at least in part, to minimize the potential for weakening the judiciary by forcing judges to unnecessarily step down from deciding cases.

Because of the affirmative obligation judges have to decide matters presented to them and because of the presumption of fairness that judges are entitled to, a high threshold must necessarily be met before a judge may be recused from a case. Further, to give proper deference to the ability of sworn judicial officers to set aside personal beliefs and decide cases solely on the facts

2

presented and the relevant law and to prevent the possibility that recusal will be required in cases in which it is unwarranted, a recusal determination must be made in light of all the circumstances and not on isolated facts divorced from the larger context in which they occurred.

When, as here, the basis upon which recusal arguments are made originates from events occurring during a judge's previous legal career, the determination must be made in light of the fact that while engaged in the practice of law, lawyers are required to serve as the legal representatives for their clients and, in that capacity, express the desires, beliefs, and recollections of their clients and vigorously advocate their clients' interests. For this reason, statements made by a lawyer in a representative capacity, without more, can only rarely serve as legitimate reasons for excluding a judge from fulfilling his sworn duties.

Were the rule otherwise, judges would be recused from presiding over all cases that present issues similar to the ones that they confronted in their prior careers as advocates. By having fulfilled their professional responsibility to advocate their clients' interests, judges would face recusal from all cases involving the same areas of law or types of claims regardless of the identity of the parties involved. Moreover, this rule would lead to the paradoxical result that the more expansive a judge's prior practice area and experience, the more limited his judicial role could be. Such a result would not be in the best interests of the citizens of Texas, potential litigants, attorneys, or members of the judiciary.

In this case, the State has argued that documents filed by Justice Waldrop while he was engaged in private practice that advanced the assertions of his former client directed at the plaintiffs in a civil suit that allegedly addressed the same or similar conduct at issue in this case are

3

sufficient to warrant his recusal from further participation in this case. Specifically, the State contends that although the plaintiffs in the civil suit are not parties to the current case, although it has not been shown that the State was a party to the civil suit, and although Justice Waldrop's former client was not a party to either case, Justice Waldrop should be recused from further participation in this case because, when asked to effectuate his client's desire to resist discovery requests submitted to his former client by the plaintiffs to the civil suit, he filed documents containing statements that the State contends disparaged the merits of the plaintiffs' claims. The State also posits that it is possible that Justice Waldrop could have obtained personal knowledge of the facts relevant to the criminal case through his attenuated involvement in the civil suit. However, the real core of the State's complaint is that the documents filed by Justice Waldrop demonstrate his bias and partiality against the State in this criminal case.

As proof of that assertion, the State attached documents signed by Justice Waldrop and filed on behalf of his former client in the civil suit. Those attachments reveal that the documents and statements were filed by Justice Waldrop in his role as an advocate for his client who had not been accused of any wrongdoing. Further, the attachments show that neither Justice Waldrop nor his client had been served with all of the various pleadings filed in the civil suit detailing the basis for the civil suit. In addition, as mentioned previously, the attachments demonstrate that the documents were filed in response to discovery requests served on his non-party client and communicated his client's desire to resist being compelled to disclose the information requested or becoming embroiled in the civil suit. Notably, nothing in the State's motion or attachments reveals that Justice Waldrop's participation in the civil suit extended beyond responding to the discovery

4

requests or that Justice Waldrop, through that limited representation, obtained personal knowledge of any facts pertinent to the issues in the underlying appeal in this case. Similarly, the State does not allege that Justice Waldrop was involved with the parties to the civil suit or with the issues that were the subject of the civil suit.

In light of those attachments, it is important to recognize that we are not confronted with determining whether Justice Waldrop should be recused from further participation in this criminal appeal because, during his prior legal career, he actively participated in a civil suit allegedly addressing the same or similar conduct and issues present in this case; rather, we are confronted with determining whether he should be recused from this case because, while acting as an advocate for his client that was not a party to the civil suit, he filed documents containing his client's assertions that the civil suit was politically motivated. For the reasons that follow, we do not believe recusal is warranted under these circumstances.

## DISCUSSION

*Recusal is Not Warranted in this Case*

On August 22, 2008, this Court issued a majority opinion addressing the merits of the claims raised by the parties in the underlying case, and on September 22, 2008, the State filed a motion for rehearing and a motion for reconsideration en banc. One day later, the State also filed a motion to recuse Justice Waldrop from participating in the resolution of either motion. After the motion to recuse was filed, Justice Waldrop certified the matter to the Court so that the remaining eligible members of the Court could decide the matter. *See* Tex. R. App. P. 16.3(b). The State's motion to recuse is based entirely on written statements made in connection with a separate

5

civil lawsuit. That suit was filed by four plaintiffs who ran for political office but did not win their respective elections. The plaintiffs in the suit, Paul Clayton, Mike Head, David Lengenfeld, and Ann Kitchen, sought damages from Texans for a Republican Majority Political Action Committee ("TRMPAC"), Bill Ceverha individually and as treasurer for TRMPAC, James Ellis, and John Colyandro, for alleged election code violations occurring during the plaintiffs' campaigns. During the civil suit, the plaintiffs sought to compel the disclosure of information from another entity, Texans for Lawsuit Reform ("TLR"). TLR was not a party to the civil suit. The civil suit was filed prior to Justice Waldrop's appointment to the Court, and at the time the suit was filed, TLR was represented by Justice Waldrop. The statements that are the subject of the motion to recuse were filed by Justice Waldrop in his role as an advocate for TLR and were made in response to the discovery requests previously mentioned. While carrying out his client's desire to resist attempts to force it to disclose information or be pulled into a conflict between TRMPAC and the plaintiffs, Justice Waldrop signed various pleadings on behalf of his client, which, among other things, communicated his client's belief that the civil suit filed by the plaintiffs was a "politically motivated lawsuit." The State alleges that the statements prove that Justice Waldrop is biased and compel his recusal from further participation in the case. Having reviewed the State's motion and attachments, we conclude that the tangential statements filed by Justice Waldrop on behalf of his client who was not a party to and was not alleged to have been involved in the subject matter of the separate civil suit are insufficient, as a matter of law, to warrant recusal from consideration of the State's motion for rehearing and motion for reconsideration en banc. Accordingly, we deny the State's motion to recuse.

6

Judges are obligated to decide matters presented to them and must not unnecessarily recuse themselves, *Rogers v. Bradley*, 909 S.W.2d 872, 879 (Tex. 1995) (Enoch, J., concurring); *see In re K.E.M.*, 89 S.W.3d 814, 819 (Tex. App.—Corpus Christi 2002, no pet.), even in circumstances in which the judges might prefer not to decide the matters, *Sears v. Olivarez*, 28 S.W.3d 611, 614 (Tex. App.—Corpus Christi 2000, no pet.). *Cf. Cheney v. United States Dist. Court*, 541 U.S. 913, 928 (2004) (per Justice Scalia, as single Justice) (noting that because there was no basis for recusal, justice was not free to recuse himself even though recusal would have allowed him to avoid great "deal of embarrassing criticism and adverse publicity" and attacks on his integrity). In fact, judges have "as much of an obligation not to step down from a case when there is no reason to do so as they have to do so when there is a reason." *In re K.E.M.*, 89 S.W.3d at 819; *see Sensley v. Albritton*, 385 F.3d 591, 598-99 (5th Cir. 2004); *Rogers*, 909 S.W.2d at 879 (Enoch, J., concurring).

Although they have a duty to sit, judges may be removed from a case if they are constitutionally disqualified, subject to statutory strike, or recused under rules promulgated by the supreme court. *Olivarez*, 28 S.W.3d at 615. The rules governing recusal are found in the rules of appellate procedure and in the rules of civil procedure. *See* Tex. R. App. P. 16.1-.3 (governing recusal of appellate judges); Tex. R. Civ. P. 18a-18b (governing recusal and disqualification of judges); *see also* Tex. R. App. P. 16.2 (providing that "[t]he grounds for recusal of an appellate court justice or judge are the same as those provided in the" rules of civil procedure). In making its recusal arguments, the State relies on two rule provisions. The first provides that a "judge shall recuse himself in any proceeding in which . . . his impartiality might reasonably be questioned." Tex. R.

Civ. P. 18b(2)(a).[1]  The second provides that a "judge shall recuse himself in any proceeding in which . . . he has a personal bias or prejudice concerning the subject matter or a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* R. 18b(2)(b).  The rules at issue in this case are written generally,[2] and courts have supplied clarifying language to be utilized when making recusal determinations.  The relevant analysis to be employed is not, and cannot be, the simplistic approach advanced by the State and embraced by Justice Patterson in her dissent.  *Cf. Sensley*, 38 F.3d at 598 (warning that courts should carefully review recusal motions to prevent possibility that parties will abuse recusal procedures for dilatory or litigious purposes).

A party seeking recusal must satisfy a "high threshold" before a judge must be recused.  *See Liteky v. United States*, 510 U.S. 540, 558 (1994) (Kennedy, J., concurring). In determining whether recusal is proper for the reasons alleged by the State, "'the proper inquiry is whether a reasonable member of the public at large, knowing all the facts in the public domain

---

[1]  The statute governing recusal under federal law contains language that is identical to the recusal language in the rules of civil procedure.  *See, e.g.*, 28 U.S.C.A. § 455(a) (West 2006) (requiring judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned").  Accordingly, Texas courts have utilized federal case law interpreting relevant federal recusal statutes for guidance when applying the Texas rules for recusal.  *See, e.g.*, *Rogers v. Bradley*, 909 S.W.2d 872, 880 (Tex. 1995) (Enoch, J., concurring).

[2]  In addition to the general rules that a judge should be recused if his impartiality might reasonably be questioned or when he has a personal bias concerning the subject matter of the case, the rules also set out specific situations requiring recusal, such as if the judge or a family member is a party to or has a financial interest in the case.  Tex. R. Civ. P. 18b(2); *see Liteky v. United States*, 510 U.S. 540, 567 (1994) (Kennedy, J., concurring) (explaining that federal recusal statute, which is similar to Texas rules, addresses two types of situations: where actual or assumed bias exists and where appearance of partiality exists); *see also id.* at 548 (describing impartiality subsection as "'catchall' recusal provision").  None of those automatic recusal provisions are at issue here.

concerning the judge and the case, would have a reasonable doubt that the judge is actually impartial.'" *Kniatt v. State*, 239 S.W.3d 910, 915 (Tex. App.—Waco 2007, order) (per curiam) (quoting *Burkett v. State*, 196 S.W.3d 892, 896 (Tex. App.—Texarkana 2006, no pet.)); *see Rogers*, 909 S.W.2d at 880 (Enoch, J., concurring); *Olivarez*, 28 S.W.3d at 615. Accordingly, the determination should be made based on a studied analysis of all of the circumstances involved rather than a knee-jerk reaction to one fact in isolation. This determination employs a "reasonable-person test," *Kniatt*, 239 S.W.3d at 915, and courts evaluate the merits of a motion from "a disinterested observer's point of view," *Rogers*, 909 S.W.2d at 882 (Enoch, J., concurring); *see United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995) (explaining that courts must analyze how facts would appear to "the well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person"). *Cf. Cheney*, 541 U.S. at 914 (per Justice Scalia, as single Justice) (warning that decision regarding recusal should be made in light of facts as they actually exist and "not as they were surmised or reported"). In determining whether a reasonable, disinterested member of the community would believe recusal was required, courts must assume that the community member is aware of the realities of the practice of law, *cf. Rogers*, 909 S.W.2d at 884 (Enoch, J., concurring) (explaining that it is expected that reasonable person is "knowledgeable about the realities of judicial elections"), including the fact that lawyers are required to zealously advocate their clients' interests, *see* Tex. Disciplinary R. Prof'l Conduct preamble para. 3, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2005).

Partiality, bias, and prejudice, in the context of recusal, do "not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate." *Liteky*, 510 U.S. at 550, 552.

Stated differently, the terms refer to "predispositions that go beyond what is normal and acceptable" or to "favorable or unfavorable" dispositions that are "excessive in degree." *Id.* at 550. Accordingly, the need for recusal is triggered only when a judge displays an "attitude or state of mind so resistant to fair and dispassionate inquiry" as to cause a reasonable member of the public to question the objective nature of the judge's rulings. *See id.* at 557-58 (Kennedy, J., concurring).

Courts enjoy a "presumption of judicial impartiality." *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd). The presumption no doubt results from the well-accepted notions that conscientious judges will nullify the effect of any potential bias by making themselves aware of those possible biases and that they understand "their duty to render cases upon a proper record and to disregard" extraneous matters. *Liteky*, 510 U.S. at 562 (Kennedy, J., concurring).

For all of these reasons, the movant bears the burden of proving that recusal is warranted. *Abdygapparova*, 243 S.W.3d at 198. That burden is only satisfied when the movant provides facts demonstrating the presence of bias or partiality "of such a nature and extent as to deny the movant due process of law."[3] *Office of Pub. Util. Counsel v. Public Util. Comm'n*, 185 S.W.3d 555, 574 (Tex. App.—Austin 2006, pet. denied); *Roman v. State*, 145 S.W.3d 316, 321 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *see Abdygapparova*, 243 S.W.3d at 198 (explaining that movant must show high level of antagonism that is so deep-seated that it would be impossible for judge to render fair judgment). Conclusory statements, conjecture, or mere assertions of bias will not satisfy the burden or overcome the presumption of impartiality. *Rogers*, 909 S.W.2d

---

[3] In its motion, the State does not argue that any due process violation occurred, and we have found no evidence of a due process violation during our review of the record.

10

at 881, 884 (Enoch, J., concurring); *Abdygapparova*, 243 S.W.3d at 198; *see also 1001 McKinney Ltd. v. Credit Suisse First Boston Mortgage Capital*, 192 S.W.3d 20, 27 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (explaining that conclusory statements are ones that do not provide underlying facts to support conclusion).

As support for its claims that recusal is warranted in this case, the State attached to its motion documents produced in the civil suit discussed earlier. The plaintiffs in that suit sought information from TLR, a nonparty to that suit, regarding communications TLR had with TRMPAC, its treasurer, Colyandro, and Ellis. None of the documents attached to the State's motion alleged that TLR was a participant in any wrongful conduct or that the State was a party to the civil suit in any capacity.

Justice Waldrop, who represented TLR at the time, filed the documents at issue containing TLR's objections to the plaintiffs' discovery requests sent to TLR and to the plaintiffs' decision to attempt to involve TLR in a dispute in which it was not a party. The State included those objections in three appendices to its motion to recuse, and those objections constitute the entirety of the basis for the State's assertion that Justice Waldrop should be recused from participating further in this habeas case, which arises out of a separate criminal proceeding.

The first appendix contains TLR's objections and responses to the plaintiffs' "Amended Deposition by Written Questions Propounded" to TLR and to the plaintiffs' subpoena duces tecum seeking production of various materials. In the document, TLR objected to the information sought by the plaintiffs on several grounds, including that the information was not relevant, was confidential, was protected by attorney-client privilege, and was not sought in compliance with the rules of civil procedure and that the requests were overly broad and

11

burdensome. Further, TLR commented that it "is not a party to th[e] lawsuit and no allegations have ever been made by anyone against TLR." In its motion, the State highlights the following statement, which largely forms the basis for the State's motion to recuse, made in TLR's response: "TLR has no information relevant to the allegations in this politically motivated lawsuit, and will resist any attempts by the Plaintiffs to harass political opponents using tools designed for legitimate civil disputes."

The second appendix contains TLR's response to a motion to compel filed by the plaintiffs and various exhibits attached to the response. In the response, TLR urged the trial court to rule on TLR's earlier response to the plaintiffs' discovery requests and to deny the plaintiffs' motion to compel. In the response, TLR stated that it had "not been served with various documents and pleadings" filed in the civil suit and repeated that it was not a party to the lawsuit. Moreover, TLR stated that the plaintiffs had made no allegations against TLR and had in no way asserted that TLR was connected with any of the election code violations alleged by the plaintiffs. Additionally, TLR noted that the plaintiffs were seeking information regarding any communications that TLR may have had with TRMPAC regardless of whether those communications had any bearing on the civil suit. For that reason and in light of the fact that TLR and the plaintiffs in the case were political opponents, TLR stated that the plaintiffs were "attempting to use the discovery process in this lawsuit to harass a political opponent who is not a party to the suit."[4] (Emphasis removed).

---

[4] The State argues that the quoted statement above and the repetition of it in the other documents attached to the State's motion establish the need for recusal. Although we need not decide the matter here, these statements seem more to be criticizing the plaintiffs' decision to serve TLR with discovery requests rather than making a comment on the merits of the suit.

12

The third appendix contains an additional response and objection to a later deposition by written questions and subpoena duces tecum filed after the one addressed by the response included in the first appendix. The response contains objections by TLR that are similar to the ones made in the prior response.

The statements referring to the civil suit as "politically motivated" and objecting to the use of the discovery process to harass a nonparty quoted above form the entire basis for the State's allegations that Justice Waldrop should be recused from further participation in the case. In determining whether those statements form a sufficient basis for recusal, they must be viewed in the context of the documents and the civil suit in which they were made. The statements were made by TLR in response to discovery requests made by plaintiffs in the civil suit who are not parties to the underlying appeal in this case. Furthermore, the position advanced by TLR was that it was not a party to the civil suit, it had not been served with documents relating to the suit, it had no information relevant to the suit, and it had not been accused of engaging in conduct that connected it to the subject matter of the suit. More importantly, it was in his capacity as advocate for TLR that Justice Waldrop filed the documents containing the disputed statements.

Because judges come to office after years of work in the legal field, *see* Tex. Const. art. 5, §§ 2(b), 6 (requiring candidate for court of appeals to have 10 years experience in legal field), it would be highly unusual for a judge to assume office without having publicly expressed an opinion regarding legal issues at some point in their previous careers. *Republican Party of Minn. v. White*, 536 U.S. 765, 777-78 (2002).[5] However, opinions expressed by an individual prior to becoming a

---

[5] We note that it would not be desirable to fill the judiciary with judges who have never expressed opinions regarding legal issues because that failure would be evidence of the judges' lack of qualification for office rather than a testament to their lack of bias. *See Republican Party of Minn. v. White*, 536 U.S. 765, 778 (2002).

13

judge generally should not prevent him from sitting as a judge because there is a distinction between having personal views and complying with the obligations judges take an oath to uphold and because "every good judge is fully aware of the distinction." *Id.* at 798 (Stevens, J., dissenting); *see Lombardino v. Firemen's & Policemen's Civil Serv. Comm'n*, 310 S.W.2d 651, 654 (Tex. Civ. App.—San Antonio 1958, writ ref'd n.r.e.) (explaining that judges should not step down from presiding over cases simply because of personal statements previously expressed); *see also Chastain v. State*, 667 S.W.2d 791, 796 (Tex. App.—Houston [14th Dist.] 1983, pet. ref'd) (concluding that making public statements communicating personal beliefs regarding death penalty was not grounds for removal from capital murder case). Stated differently, it "is presumed that a judge can and will divest himself of any previous conceptions, and that he will base his judgment, not on what he originally supposed but rather upon the facts as they are developed at trial." *Lombardino*, 310 S.W.2d at 654. For this reason, impartiality is not measured by the number of opinions that an individual has formed over his or her life but by "the ability both to reevaluate them in light of an adversarial presentation, and to apply the governing rule of law even when inconsistent with those views." *White*, 536 U.S. at 801 (Stevens, J., dissenting). In fact, in their prior careers, judges often commit themselves "to legal issues that they" are later called to rule on in their judicial capacities. *Id.* at 779. It is for these reasons that "avoiding judicial preconceptions on legal issues is neither possible nor desirable" and that "pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest." *Id.* at 778.

In this case, we are not even confronted with a situation in which a justice has made public a personal belief regarding how a legal issue should be resolved. Rather, we are confronted

14

with determining whether the contested statements made on behalf of a former client may be deemed to be statements made by Justice Waldrop in his personal capacity, and even if so, whether the statements indicate an unfairly biased attitude toward the subject matter of the current appeal or a party to it. Lawyers, as advocates, act as the legal representatives for their clients. *See* Tex. Disciplinary R. Prof'l Conduct preamble para. 3 (West 2005). As such, lawyers stand in the place of their clients, *see McMahan v. Greenwood*, 108 S.W.3d 467, 488 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (explaining that legal representatives stand in place of others and represent their interests), and are required to zealously pursue their clients' interests, Tex. Disciplinary R. Prof'l Conduct preamble para. 3 (West 2005). However, the clients establish the objectives to be reached through representation, Model R. Prof'l Conduct, R. 1.2(a) (2003), and have the decision-making authority regarding the representation, *see* Model Code Prof'l Responsibility EC 7-7 (1980). Furthermore, a "lawyer's representation of a client . . . does not constitute an endorsement of the client's political . . . views or activities," Model R. Prof'l Conduct, R. 1.2(b) (2003); *see also* Model Code Prof'l Responsibility EC 7-17 (1980) (explaining that lawyer has no obligation to adopt personal viewpoint favorable to interests of his client). For these reasons, although as an advocate a lawyer is often required to file pleadings and other legal documents, the assertions made in those documents reflect the beliefs, wishes, or recollections of their clients and rarely represent personal statements by the lawyer. *See* Model R. Prof'l Conduct, R. 3.3 cmt. 3 (2003).

It was in this capacity that Justice Waldrop filed the documents communicating his client's belief that the civil suit between the political opponents was "politically motivated."**[6]** No

_____

**[6]** In her dissent, Justice Patterson suggests that Justice Waldrop should have made some form of disclosure to either the parties involved or to his colleagues. Initially we note that current rules of

15

showing has been made that the statements represented Justice Waldrop's personal beliefs rather than merely reflecting the beliefs of his clients. To the contrary, the evidence presented in the State's motion establishes that the statements were made on behalf of TLR. Additionally, other than demonstrating that Justice Waldrop expressed his client's desires to not become involved in the civil suit, the State has not shown that Justice Waldrop had any further or more direct involvement in the case. Although the State asserts in its motion that the issues presented in the civil suit originated from the "same matter in controversy" dealt with in the underlying criminal appeal, it cannot be disputed that the State has not shown that either the facial constitutionality of the applicable election code provisions or the proper construction and scope of the applicable money-laundering statute were at issue in the civil case. Moreover, given that the statements at issue were made in response to discovery requests filed by plaintiffs in the civil suit who are not parties to the underlying appeal in this case and that no showing has been made that the State was a party to the civil suit, the State has not demonstrated that it would be appropriate to somehow impute the statements to this criminal proceeding. Accordingly, the statements do not evidence some form of wrongful, excessive, or inappropriate bias or partiality either in favor of the defendants in this case or against the State.[7]

---

civil procedure do not mandate, or even suggest, a "disclosure" requirement. Such a requirement, for purposes of exploring and probing potential bias, is incongruous with the presumption of impartiality afforded our judiciary. Moreover, given the public nature of Justice Waldrop's representation of TLR, as discussed more thoroughly in footnote eight, and the attenuated nature of his involvement in the separate civil suit, it is not readily apparent what additional information could have reasonably been expected to have been disclosed, and Justice Patterson does not suggest what the disclosure should have been.

[7] In a footnote in her dissent, Justice Patterson refers to two rules of professional conduct in an attempt to bolster her assertion that recusal is warranted in this case. The first is rule 1.06, which covers potential conflicts of interest and prohibits a lawyer from representing "opposing parties to the same litigation." Tex. Disciplinary R. Prof'l Conduct 1.06(a) (West 2005). No allegation has been made that Justice Waldrop represented opposing parties in the same case. The

When the "political" statements are viewed in the context in which they were made and properly credited to their source, no reasonable, disinterested member of the public, knowing all of those facts and being aware of the advocate role attorneys occupy, would have a reasonable doubt as to Justice Waldrop's impartiality or would conclude that Justice Waldrop had displayed any predisposition that would call into question the objective nature of his ruling in these separate criminal matters. The reference to the separate civil case as "politically motivated" in that context does not overcome the presumption of impartiality afforded to members of the judiciary or reach the high threshold needed for recusal. In fact, although it is not necessary to resolve the point here, we note that because the phrase "politically motivated" was used to describe the plaintiffs' *motives* for filing the civil suit, it far from clear that the statement is in fact an attack on the *merits* of the law suit. Regardless, the State has not shown that TLR's assertions should be attributed to Justice Waldrop in a personal capacity, and the statements, therefore, cannot serve as support for the State's contention that Justice Waldrop has exhibited partiality or bias that warrants his recusal from further participation in this case.

Were we to conclude that the tangentially made statements at issue here were sufficient to overcome a judge's duty to sit and decide a case, then the same logic would seem to require recusal in situations no one would argue are appropriate. For example, if a judge, while acting as an advocate in his prior career, expressed his client's belief that an opposing side's

second is rule 1.10, which governs successive government and private employment. *Id.* R. 1.10 (West 2005). That rule prohibits, with some exceptions, a lawyer serving in public office from participating "in a matter involving a private client when the lawyer had represented that client in some manner while in private practice." No allegation has been made that Justice Waldrop ever represented any of the parties in this appeal.

17

arguments were not correct or referred to an opposing party's arguments as being "without merit," then he would be required to recuse himself from all cases in which similar claims or arguments could be made. *Cf. Aguilar v. Anderson*, 855 S.W.2d 799, 802 (Tex. App.—El Paso 1993, writ denied) (warning of dangers of broadening bases for recusal to situations in which it is not warranted); *see also Rogers*, 909 S.W.2d at 884 (Enoch, J., concurring) (explaining that broadening recusal net too wide could virtually remove judges "from the duties of the office to which they were elected"). Additionally, if a judge while acting as an advocate in his previous career, communicated his clients' beliefs about what the law should be or how a court should construe the law, that judge would be required to recuse himself from presiding over cases addressing that area of the law. Although impartiality is fundamental in our system of jurisprudence, recusal is not warranted in those circumstances. *Cf. Liteky*, 510 U.S. at 551-52 (explaining that judges are not required to display "child-like innocence").

Finally, we note that although the State alleges that it is possible that Justice Waldrop obtained personal knowledge of disputed evidentiary facts, the State has failed to produce any evidence showing that Justice Waldrop gained any personal knowledge pertinent to the present case as a result of his representation of TLR. *See Pasley v. Pasley*, 2005 Tex. App. LEXIS 6680, *4-5 (Tex. App.—Amarillo Aug. 18, 2005, no pet.) (not designated for publication). Because the State's argument on this point amounts to no more than mere speculation, the State has failed to satisfy its burden of showing that recusal is warranted.

For all the reasons previously given, we conclude that the grounds for recusal alleged by the State are insufficient to require recusal in this case.

*The State Failed to Promptly Request Recusal in this Matter*

In addition to failing to demonstrate that recusal is required, the State also failed to comply with the rules of appellate procedure governing when motions to recuse may be filed. Appellate rule 16.3, which governs the procedure under which a party may request that an appellate justice be recused from a case, states that "[a] party may file a motion to recuse a justice or judge before whom the case is pending" and that "[t]he motion *must be filed promptly* after the party has reason to believe that the justice or judge should not participate in deciding the case." Tex. R. App. P. 16.3 (emphasis added). In other words, the rules require that a motion to recuse an appellate justice be filed at the earliest possible moment, preferably when the case is appealed or assigned to a panel. For the reasons that follow, we conclude that the State's motion was not promptly filed.

Justice Waldrop's representation of TLR was public knowledge,[8] and the State acknowledges that it was aware of that representation during the pendency of this proceeding. *See Blackwell v. Humble*, 241 S.W.3d 707, 714 (Tex. App.—Austin 2007, no pet.) (concluding that motion to recuse was untimely because it was not filed until over one year after first hearing in case

---

[8] We note that Justice Waldrop was a panelist in a companion case to the current appeal, but the State did not seek to recuse him in that case. *See State v. DeLay*, 208 S.W.3d 603 (Tex. App.—Austin 2006) (holding that conspiracy provision in penal code is limited to offenses found within penal code and did not apply to criminal conduct found within election code), *aff'd sub nom.*, *State v. Colyandro*, 233 S.W.3d 870 (Tex. Crim. App. 2007). Further, we note that numerous articles were written about this appeal and the companion case that discussed Justice Waldrop's prior relationship with TLR and how the State had not sought his recusal in either appeal. *See, e.g.*, April Castro, *State Will Argue to Restore Dropped Charges Against DeLay* (Mar. 22, 2006), *available at http://www.dallasnews.com/sharedcontent/APStories/stories/D8GGFU5G2.html*; R.G. Ratcliffe *DeLay Case may Once Again Face Bias Issue*, Houston Chronicle, Mar. 21, 2006, at A1, *available at* http://www.chron.com/CDA/archives/archive.mpl?id=2006_4083081; Collin Jergens, *DeLay's Friends in High Places* (Mar. 21, 2006), *available at* http://citizen.typepad.com/watchdog_blog/2006/03/delays_friends_.html; Charles Kuffner, *The Judges in the Court go Round and Round* (Mar. 21, 2006), *available at* http://www.offthekuff.com/mt/archives/007014.html.

had occurred and because prior interactions between judge and party, which served as basis for recusal, were well known months before motion was filed). Further, the existence of the civil suit was also public knowledge, and the documents drafted by Justice Waldrop while acting as an advocate for TLR were available to the public. The State had every opportunity to investigate Justice Waldrop and any of the other panelists if it felt that there was any possibility that bias or partiality might play a factor in the rendition of the Court's judgment. Moreover, given the fact that the cause was pending before this Court for two years, the State had more than ample time in which to complete an investigation before the panel opinion was released. If the State was concerned about the makeup of the panel, it had an obligation to disclose those concerns at the earliest possible time.

Despite the diligence that the State has displayed in every facet of prosecuting this case, it insists that it only became aware of the alleged potential bias after the panel opinion issued and in the weeks leading up to the filing of its motion to recuse. However, the State has provided no explanation as to why it was not possible for it to acquire the information on which it bases its motion to recuse until after our opinion was released. *Cf. Martin v. State*, 876 S.W.2d 396, 397 (Tex. App.—Fort Worth 1994, no pet.) (explaining that, in trial court context, deadline for filing motion to recuse can be extended when it is impossible for person to know of grounds for recusal until after deadline has run).

The burden was upon the State to demonstrate at the earliest possible time why recusal was warranted in this case. In light of the facts that the information upon which the State bases its claims was readily available and that the State provided no explanation as to why it was only able to discover the information after our opinion was released, we cannot conclude that the State complied with its obligation to promptly file a motion to recuse. This determination is

20

supported by the fact that the motion to recuse was not filed until after this Court released an opinion that was not favorable to the State. *Cf. Rx.com v. Hruska*, 2006 U.S. Dist. LEXIS 76427, *6 (S.D. Tex. Oct 20, 2006) (explaining that waiting to file motion to recuse until after final judgment is issued, particularly when judgment is against movant, "is suspect").

Were we to conclude that this motion was proper under these circumstances, we would essentially encourage a party who possesses information potentially requiring recusal to sit on the information and wait to see how the Court rules. If the result is displeasing, the party could, without explanation, file a motion to recuse as an attempt to get a second review of the case by a new panel. We cannot endorse a result that could result in such improper gamesmanship, *see Janicek & Ol'Don v. Kikk Inc.*, 1995 Tex. App. LEXIS 799, *3-4 (Tex. App.—Houston [14th Dist.] 1995, writ. denied) (disapproving of parties taking "wait and see" approach to filing motions for recusal by waiting to see if result is favorable); *Rx.com*, 2006 U.S. Dist. LEXIS 76427 at *6 (explaining that allowing parties to wait to file motions to recuse until after adverse rulings might lead to unscrupulous actions by dissatisfied parties), nor can we encourage parties to behave in a manner that is inconsistent with the rules of appellate procedure and that could lead to significant waste of judicial resources.

For all the reasons discussed, we cannot conclude that the State's motion was timely filed in compliance with the rules of appellate procedure.

This determination is also supported by case law addressing the recusal of appellate judges, which requires that a motion to recuse be filed before an opinion is released. *McCullough v. Kitzman*, 50 S.W.3d 87, 88 (Tex. App.—Waco 2001, pet. denied) (explaining that rules require party to file motion to recuse before opinion is issued and that time to file motion expires once opinion

has been released); *see F.S. New Prods., Inc. v. Strong Indus., Inc.*, 129 S.W.3d 594, 603 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (Jennings, J., dissenting) (concluding that party waived right to request recusal by waiting to file motion until after opinion had been released)[9]; *see also Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.,* 130 S.W.3d 181, 189-90 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (explaining that waiver is intentional relinquishment of known right or intentional conduct inconsistent with that right and may be established by silence or inaction for long period of time); *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (noting that even constitutional claims may be waived if not properly presented for appellate review). Both the opinion in *McCullough* and the dissent in *F.S.* based their analyses on the wording of rule 16.3, which allows a party to file a motion to recuse a justice "before whom the case is *pending*" and requires that the party file the motion when he "has reason to believe that the justice or judge should not participate in *deciding the case.*" Tex. R. App. P. 16.3 (emphases added). Essentially, the courts concluded that the rules did not allow a party to file a motion to recuse after an opinion has been released because the case has already been decided and is no longer pending.[10]

---

[9] The reasoning in these opinions is consistent with case law regarding the recusal of trial judges. *See* Tex. R. Civ. P. 18a(a) (requiring party asserting trial judge should be recused to file motion asserting grounds for recusal "[a]t least 10 days before the date set for trial or other hearing"); *see, e.g.*, *Arnold v. State*, 853 S.W.2d 543, 544-45 (Tex. Crim. App. 1993) (explaining that party that fails to file motion to recuse within time specified waives error); *Reese v. State*, 905 S.W.2d 631, 636 (Tex. App.—Texarkana 1995, pet. ref'd, untimely filed) (concluding that motion to recuse was defective because it was not timely filed); *Wirtz v. Massachusetts Mut. Life Ins. Co.*, 898 S.W.2d 414, 423 (Tex. App.—Amarillo 1995, no writ) (explaining that procedural requirements of rule 18a are mandatory and that failure to comply waives right to complain regarding judge's failure to recuse himself); *Enterprise-Laredo Assocs. v. Hachar's, Inc.*, 839 S.W.2d 822, 840 (Tex. App.—San Antonio 1992, writ denied) (same); *Vickery v. Texas Carpet Co., Inc.*, 792 S.W.2d 759, 763 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (same).

[10] It is worth noting that in its motion, the State acknowledges that it filed its motion after "the panel has handed down its opinion."

The conclusions reached by the majority in *McCullough* and by the dissent in *F.S.* are supported by the manner in which courts have employed the phrase "deciding the case." Courts routinely use the phrase to refer to the initial rendition of judgment by an appellate court and the issuance of an opinion. For example, in *St. Joseph Hosp. v. Wolff*, the supreme court used the phrase in reference to the appointment of a justice to a case that was already under submission so that the justice could "participate in deciding the case." 94 S.W.3d 513, 519 n.10 (Tex. 2002). Additionally, in *Texas Attorney General's Office v. Adams*, the court referred to writing and releasing its opinion as "deciding the case." 793 S.W.2d 771, 773 (Tex. App.—Fort Worth 1990, no writ); *see Skinner v. State*, 647 S.W.2d 686, 692 (Tex. App.—Houston [1st Dist.] 1982, pet. ref'd) (referring to its written opinion as "deciding" case at bar); *Salpas v. State*, 642 S.W.2d 71, 74 (Tex. App.—El Paso 1982, no pet.) (implying that another court's release of opinion decided that case); *Rogers v. Port City Barber & Beauty Supply Co.*, 138 S.W.2d 219, 220 (Tex. Civ. App.—Galveston 1940, no writ) (concluding that "decision" is reached in trial context when court rules for one party); *see also Kennard Corp. v. Mitchell Indus. Tire Co.*, No. 01-89-00127-CV, 1990 Tex. App. LEXIS 438, *8 (Tex. App.—Houston [1st Dist.] 1990, no writ) (not designated for publication) (referring to "deciding the case" as deciding based on issues presented by briefs filed in case).

Courts have also used the phrase "deciding a case" to distinguish between originally releasing an opinion in the case and entertaining motions filed after an opinion is released. For example, in *Ex Parte Wilson*, when determining which judges could hear an en banc motion, the court noted that the en banc panel consisted of members "of the panel deciding the case" and other justices. 25 S.W.3d 932, 932 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *see also American*

*Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805 (Tex. 2002) (distinguishing between panelists who decided case and members of court that later wrote in response to motion for reconsideration en banc); *O'Connor v. First Court of Appeals*, 837 S.W.2d 94, 97 (Tex. 1992) (holding that "when a court of appeals votes against hearing a case en banc, any member of the court is entitled to file a dissent, regardless of whether the judge was on the *original panel deciding the case*") (emphasis added). Similarly, in *Edwards v. State*, when referring to a prior case, the court noted that a particular justice "wrote the opinion deciding the case" and distinguished the writing of the original opinion from the opinion that the court released on rehearing. 406 S.W.2d 537, 540 (Tex. Civ. App.—Corpus Christi 1966, writ ref'd); *see also International Travelers Ass'n. v. Peterson*, 183 S.W. 1196, 1198 (Tex. Civ. App.—Austin 1966, no writ) (op. on reh'g) (referring to opinion written before motion for rehearing was filed as "deciding the case").

Additionally, the conclusions reached by the dissent in *F.S.* and the majority in *McCullough* are consistent with the rules of appellate procedure governing motions for rehearing and en banc reconsideration. *See* Tex. R. App. P. 49.1-.10. Nothing in those rules directly authorizes the removal of a justice who was on a panel that decided the case from considering a motion for rehearing or a motion for en banc reconsideration filed after the panel opinion was issued. To the contrary, the rules seem to contemplate that the same panel that decided a case will also rule on any motions for rehearing. *See id.* R. 49.3 (explaining that motion for rehearing may be granted by "a majority of the justices *who participated in the decision of the case*") (emphasis added).

Although in this case we need not determine whether the rules ever allow a party to file a motion to recuse an appellate judge after an opinion has been released, we conclude that in this case, the failure to file before the opinion was released militates against a finding that the motion was

24

timely filed. For all the reasons previously given, we conclude that the State's motion to recuse was not timely filed.[11]

*Justice Patterson's Dissent*

Because Justice Patterson's dissent attempts to insert suspicion and intrigue into what have been routine decisions by this Court, we, reluctantly, feel the need to respond to her dissent. In her dissent, Justice Patterson refers to various actions taken by this Court but provides little or no context to the actions. Because the context is relevant, we supply it here. As indicated by the style of the case, the underlying opinion in this case covers 17 cause numbers: 2 "Ellis" appeals and 15 "Colyandro" appeals. The *Ellis* and *Colyandro* appeals were filed separately, but the notices of appeal for both sets of cases were filed on the same date, September 12, 2005. Ellis and Colyandro filed their briefs on November 14, 2005, and November 22, 2005, respectively. The State filed its briefs in both sets of appeals on the same day, January 11, 2006. The State filed a brief in each cause of action. The two sets of cases were originally set for submission without oral argument on January

---

[11] We note that in her dissent, Justice Patterson concludes that the State complied with the prompt requirement of appellate rule 16.3 because the State "had no reason to question Justice Waldrop's impartiality until the Court's opinion in these proceedings was released." If we were to adopt this test for timeliness regarding motions to recuse, then no motion to recuse would need to be filed before the release of an opinion, which could lead to the needless consumption of judicial resources discussed previously. Moreover, we strongly dispute that the test for determining whether recusal is warranted turns solely on whether the outcome of the opinion was favorable to the party seeking recusal. Given the nature of judicial proceedings, generally one party will be satisfied with the result, and one party will be dissatisfied. *See White*, 536 U.S. at 798 (Stevens, J., dissenting) (explaining that judges must make decisions in cases and that those decisions will be "disliked by at least 50 percent of the litigants who appear before them"). For this reason, the release of an opinion that is contrary to the result desired by a party cannot, without more, signal the need for recusal. The need for recusal is either present or not, and that determination cannot rest solely upon the outcome of the case.

11, 2006, with the *Ellis* appeals being assigned to a panel consisting of Justices Smith, Patterson, and Puryear and with the *Colyandro* appeals being assigned to a panel consisting of Chief Justice Law and Justices Pemberton and Waldrop. Because the issues involved in both sets of appeals cases were the same, the State's briefs filed in the *Ellis* appeals are nearly identical to the briefs filed in the *Colyandro* appeals, including the use of the word "appellant" to describe both Ellis and Colyandro. This fact is confirmed by a post-submission letter filed by the State in June 2008 seeking to consolidate the *Ellis* appeals with the *Colyandro* appeals for the purpose of filing post-submission briefing. In the motion, the State explained that Ellis's and Colyandro's "briefs contained essentially the same content, as did the State's responses to those briefs."

Although the appeals were originally set for submission on briefs, further review indicated that oral argument would assist the Court in determining the issues presented in the cases. It is not unusual for a panel on this Court to reset a case for oral argument after originally submitting it on briefs. In fact, panels of this Court, including those on which Justice Patterson has sat, routinely request that parties present oral arguments in order to clarify or expound upon the issues raised in their briefs. The decision to resubmit the cases for oral argument was made in July 2006, which meant that oral argument could not occur until August 2006. *See* Tex. R. App. P. 39.9 (requiring appellate courts to give parties at least 21 days' notice of its intention to set case for oral argument).

Because the issues raised in both sets of appeals were identical; because the original *Colyandro* panel had 15 causes assigned to it; because one of the panelists from the original Ellis panel, Justice Smith, was set to retire a few months after oral argument was set to be heard; and because it was unlikely that there would be sufficient time between the August oral argument and

26

Justice Smith's retirement to release an opinion in the *Ellis* appeals and rule on any motions for rehearing, the decision was made to consolidate both sets of appeals and resubmit the *Ellis* cases to the *Colyandro* panel. *See* Tex. R. App. P. 41.1 (explaining that unless court agrees to decide case en banc, case must be assigned to panel consisting of three justices). Accordingly, the cases were resubmitted on July 11, 2006, and set for oral argument on August 22, 2006. Given the complex nature of the case and this Court's common practice of resetting a case for oral argument after initial submission on briefs, the consolidation and resubmission on oral argument before the original *Colyandro* panel is hardly unusual or worthy of note, and none of the parties involved objected to that request or to the consolidation of the two sets of appeals.

In light of the preceding, we dispute Justice Patterson's assertion that the cases were "inexplicably" reassigned. Further, because the Court's treatment of these sets of cases was consistent with its prior practice and the rules of appellate procedure, we cannot help but conclude that Justice Patterson has mischaracterized the nature of the reassignment in the manner that she did in an attempt to imply nefarious motives where none could or should be found.

Justice Patterson's misrepresentations and omissions can also be found in her characterization of the events surrounding the resolution of the motion to recuse. In her dissent, Justice Patterson contends that she was improperly denied the opportunity to request a response to the motion to recuse and that this denial was contrary to the "usual practice" of this Court of obtaining responses in motions to recuse. Her assertion inaccurately represents that there is a "usual practice" of requesting responses in similar circumstances. This Court has adopted no policy regarding any type of response, let alone responses to rarely filed motions to recuse, and has

27

adopted no policy allowing a single justice to request a response without consultation with his or her colleagues.

For this reason, our decisions on whether to request a response must first be guided by the rules of appellate procedure. However, in making this determination, we must also be mindful of the fact that the relief sought by a motion to recuse is fundamentally different than any other relief parties may seek from a court through a motion.

The rules of appellate procedure provide that once a motion to recuse is filed, the challenged justice must either recuse himself or certify the matter to the "entire court." *Id.* R. 16.3(b). Further, rule 16.3 instructs that once a justice certifies the recusal matter, the court "will decide the motion by a majority of the remaining judges sitting en banc." *Id.* Unlike for other types of motions, such as motions for rehearing, the rules do not specifically address when or whether a court should request a response to a motion to recuse. *Compare id.* R. 16.1-.3 (governing disqualification and recusal of justices and covering procedure for recusal), *with id.* R. 49.1-.10 (covering motions for rehearing and specifically allowing court to request response to motion for rehearing).

This absence makes sense when we consider the unique nature of the request. In a typical non-recusal motion, interested parties present their arguments to this Court and ask us to resolve a dispute affecting the interests of both sides. When a party files a motion relevant to the resolution of the case, it is often appropriate to ask the nonmovant to respond. In these more typical situations, both parties are familiar with the subject matter of the dispute between them and generally have relatively equal access to information related to the dispute. For that reason, requesting a response from a nonmovant is appropriate and does not impose an overly onerous burden.

28

A motion to recuse, on the other hand, is procedurally very different and does not fall within that typical mold. By filing a motion to recuse, the movant asks the remaining eligible members of an appellate court to determine whether one of its members should properly preside over a case before them. The movant has the burden of presenting evidence showing that recusal is appropriate. Essentially, the movant must present facts ostensibly demonstrating bias, partiality, or some other recusal ground and then ask the court to determine whether the evidence presented, viewed in light of the rules and case law governing recusal, establishes a need for recusal. In that sense, a motion to recuse is not a dispute between the movant and the nonmovant, but is, instead, a dispute between the movant and a member of the court, with the nonmovant assuming an observer status. Because the nonmovant is not interested in the same sense that the movant is interested in the recusal dispute, there is little reason to believe that in most recusal matters, a nonmovant would have ready access to information that could shed any significant light on the recusal issue. Moreover, in those cases in which no additional facts need to be received before ruling on the motion or in which the nonmovant does not have access to the information, the only response that the nonmovant could provide would be a legal argument on why the movant's motion either does or does not establish a basis for recusal. That type of purely legal determination is a task well suited for appellate courts to perform on their own. For these reasons, under most circumstances, it would be inappropriate to order the nonmovant to undertake the added burden and expense of rebutting the assertion that recusal is appropriate under the circumstances, especially when the motion to recuse does not satisfy the movant's burden.[12]

---

[12] The role of the nonmovant would be further complicated in situations, such as this one, in which the motion to recuse is filed after the opinion has been released. If a motion to recuse is filed after a decision has been rendered against the movant and if the court requests a response, the

Furthermore, assuming that there might be circumstances in which a response to a motion to recuse might be appropriate, none of the provisions of the rules that authorize responses in other contexts lend support for the proposition that a single justice, without consultation with or approval by other members of a court, may request a response to a motion to recuse. For example, regarding motions for rehearing, the rules allow the "court" to request that a response be filed. Tex. R. App. P. 49.2. Similar language can be found in the general provision allowing a party to file a response to any motion on his own accord. That provision allows "the court" to set a deadline by which the party must file a response if the party desires to file a response in the matter. *Id.* R. 10.1(b). Finally, this same type of language is found in the provision of the rules authorizing a response to a mandamus: although a party may file a response if it wishes, the provision also allows "the court" to request a response. *Id.* R. 52.2.

Given that appellate courts are divided into panels and that the will of the court is expressed through either a majority of the justices assigned to a panel or by a majority of the justices sitting en banc, the inclusion of the word "court" in these provisions indicates that a response may only be requested if that request represents the will of the court. In other words, absent an explicit policy adopted by a court, the rules do not allow a response to be requested if a majority of the panel or the court in en banc situations does not desire one. In this case, a majority of the eligible members of this Court determined that requesting a response was not warranted or appropriate because the State failed to meet its burden of establishing a need for recusal, because the State's motion was untimely, because no additional information was necessary to make a ruling on the State's motion,

---

nonmovant would, at that point, be saddled with the burden of zealously defending the panel that decided the case in his client's favor.

30

and because it was unlikely that a response would shed any additional light on the inquiry. Accordingly, no response was requested. It is not unusual for a majority of a panel or the Court sitting en banc to decide that a response to a motion is not necessary and should not be requested. Although it is unusual for a motion to recuse to be filed, motions potentially needing responses are routinely filed with this Court. For example, panels are often called upon to decide whether they should request a response to a motion for rehearing or deny the motion without requesting a response. *See id.* R. 49.2. If a majority of the panel determines that no response is necessary and that the motion should be denied, the Court acts accordingly. *See id.* R. 49.3.

For these reasons, we cannot fully understand why Justice Patterson has chosen to repeatedly emphasize the majority's decision not to seek a response or why she has chosen to frame a typical vote in such an atypical manner. However, the tone she uses implies an intent to improperly create intrigue around a routine action by an appellate court by suggesting that the majority suppressed her response for some improper reason.[13] Although it is no doubt more interesting to suggest the presence of improper motives and maneuverings, suggesting it does not make it so. The majority of the eligible en banc justices concluded that the State's grounds for recusal were insufficient, voted to overrule the motion, and felt that a response was unnecessary. In light of those facts, we must conclude that Justice Patterson's dissent is motivated, at least in part, by extrajudicial concerns.[14]

---

[13] We note that in her dissent, Justice Patterson offers her own conclusion that Justice Waldrop represented an entity that was aligned with and had similar interests as that of Ellis and Colyandro: an assertion not made by the State in its motion. The record before us does not justify that determination.

[14] This conclusion is supported by the fact that in her dissent Justice Patterson has chosen not to respond to the law relied upon by the majority demonstrating that recusal is not warranted in these circumstances and that the State's motion was not timely filed.

*Justice Henson's Dissent*

Because Justice Henson has inaccurately depicted the resolution of the motion to recuse, we feel compelled to respond to her dissent here.

In her dissent, Justice Henson complains that the State's motion to recuse was not considered en banc. In fact, she stated that the four voting justices "refused to deliberate or consult the full Court" and asserts that at the time the motion was ruled upon, she had not yet voted. Moreover, she claims that she asked the eligible justices to afford her "additional time—no more than three days—to review the relevant legal authorities." These assertions are inaccurate.

On September 25, 2008, Justice Waldrop certified the recusal matter to the Court for consideration. Over the next few days, Chief Justice Law and Justices Puryear and Pemberton individually sent emails to the eligible justices articulating their votes that the State's motion should be overruled. After failing to receive any word from Justices Patterson or Henson regarding the motion, Justice Puryear, on October 2, sent an email to all of the eligible justices asking them to convene to discuss the matter. Justice Henson responded by stating that she was "booked up," but she made no suggestion regarding an alternative meeting time. Shortly thereafter, Justice Puryear again sent an email calling for a conference to discuss the motion. Justice Henson did not respond to that request.

On October 7, 2008, in light of the fact that a majority of the eligible justices had voted to overrule the motion more than ten days beforehand and in light of the fact that no judge had requested additional time to review the matter, Chief Justice Law sent an email to the eligible justices stating that a majority had voted to overrule the motion and that the parties would be notified of that fact. The next day and on the same day that notice was prepared and sent to the parties, Justice Henson broke her silence regarding the issue and sent an email to the clerk of this Court, asking him to provide her with a status update on the case and stating that she was still considering

32

the motion, was nearly finished with her research, and would communicate her vote to him "in the next few days."

Despite repeated calls to participate in the resolution of the motion to recuse, Justice Henson's sole act of participation in the deliberative process in the time leading up to the ruling on the motion constituted an email stating that she was too busy to convene and discuss the matter. At no time did she attempt to initiate a discussion on the issues. The motion was acted on without her participation because she chose to remove herself from the deliberative process and because a majority had already agreed to overrule the motion. Any impediment to her participation in the deliberative process was created by her own actions.

These facts belie Justice Henson's current claim that she was denied the opportunity to "participate" in the deliberations on this motion. Moreover, her characterization of these facts as well as the bitter personal attacks she employs against her colleagues, the paucity of legal support for her arguments, and her focus on the merits of the State's motion for rehearing rather than the motion to recuse all suggest that something other than a legitimate concern regarding the impartiality of one of her colleagues is driving her dissent.

Despite Justice Henson's obvious passion regarding the recusal motion, her claims of having done extensive research that was nearly finished in early October 2008, and her view that motions "to recuse should be carefully and thoughtfully considered," her dissent is conspicuously sparse in supporting legal authorities. She cites to only four opinions (other than her own dissent to the denial of her request to have the underlying appeal in this case considered en banc). Three-fourths of the citations occur in a single paragraph in her seven-page dissent. Moreover, none of the cases cited compel a determination that recusal is warranted in this case or even address a situation

remotely similar to the one presented here.[15]  In fact, not all of the cases cited even pertain to a

recusal determination.  Justice Henson relies on most of these cases for universally accepted legal

principles, such as the principle that the appearance of bias must be guarded against and that the

appearance of justice must be satisfied.  Although she cites to these general principles and

---

[15] The first case Justice Henson cites to addressed the issue of whether justices should be recused from presiding over a case in light of the fact that a political action committee produced a video endorsing them and other judges.  *See Rogers*, 909 S.W.2d 872 (Tex. 1995).  In a parenthetical, Justice Henson relates that the court in *Rogers* stated that motions to recuse should be evaluated from a disinterested observer's point of view.  The next case relied upon is *J.E.B. v. Alabama*, 511 U.S. 127 (1994), which did not address recusal and instead concerned peremptory strikes in jury trials.  In his dissent in that case, Justice Scalia stated that "the appearance of justice is as important as its reality" and noted that if "the system of peremptory strikes affects the actual impartiality of the jury not a bit, but gives litigants a greater belief in that impartiality, it serves a most important function." *Id.* at 161 n.3 (Scalia, J., dissenting).  Justice Henson's only reliance on this case is for the accepted proposition that the appearance of justice must be upheld.  The third case relied upon is *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964).  Although that case did address the potential removal of justices from presiding over cases, it did so in the context of whether behavior occurring during a trial may compel recusal in a post-trial hearing.  In that case, the Court concluded that a witness's strong objections to a judge's conduct during a trial did not compel the judge's recusal from a post-trial contempt proceeding involving the witness.  The Court determined that removal was not warranted because the party's behavior could not be construed as "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." *Id.* at 584.  In reaching a resolution in the case, the Court stated that the record before it did not compel a conclusion that "there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Id.* at 588.  Justice Henson relies on this case solely for the undisputed proposition that the appearance of bias must be guarded against.  Finally, Justice Henson cites to *In re Murchison*, 349 U.S. 133 (1955).  In that case, the Court addressed the issue of whether due process is satisfied when the "same judge presiding at [a] contempt hearing . . . also served as the 'one-man grand jury' out of which the contempt charges arose."  In determining that a due process violation is present when a judge is permitted to act in the accusatory process as a grand jury and then "try the very persons accused as a result of his investigations," *id.* at 137-39, the Court explained that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Id.* at 136 (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).  Further, the Court explained that "[s]uch a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *Id.* at 136 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).  In her dissent, Justice Henson refers to portions of the quoted sentences above.  Of the cases listed above that deal with recusal determinations, none of the circumstances addressed in those cases bear any resemblance to the facts of this case.

34

parenthetically mentions one element to be considered in recusal determinations, she offers no substantive addition or challenge to the factors to be considered in this recusal analysis.

Justice Henson does invoke the controlling legal standard—whether a reasonable, disinterested member of the public, knowing all of the facts, would have a reasonable doubt as to a judge's impartiality—but only to castigate the majority's application of that standard. The apparent basis for this assertion is that both she and Justice Patterson have filed dissents asserting that recusal is warranted. This argument overlooks the key consideration in the reasonable person test: that the member of the public be disinterested in the resolution of the recusal determination. Whatever else Justice Henson's actions and the tenor of her writing have demonstrated, at a minimum, they do not reflect the view of one who is "disinterested" in the resolution of this recusal matter.

Further, although Justice Henson asserts that the statements filed on behalf of TLR can only be read as attacking the merits of the claims filed in the civil suit, she fails to articulate any basis for why those statements should be imputed to Justice Waldrop in a personal capacity or for concluding that those statements represented Justice Waldrop's beliefs rather than those of his client. Similarly, she fails to specify how the State satisfied the high threshold necessary for recusal and for overcoming the presumption of judicial impartiality. Finally, Justice Henson has made no attempt to articulate a basis for concluding that the State's motion was timely or to directly address the case law requiring that a motion to recuse be filed before an opinion is issued.

Beyond this, Justice Henson seems far more interested in rehashing her belief that the opinion issued in the underlying appeal was wrongly decided. By now, we are all aware of Justice Henson's emphatic disapproval of the decision reached by the panel in the underlying case. *See Ex parte Ellis*, No. 03-05-00585-CR, 2008 Tex. App. LEXIS 7831 (Tex. App.—Austin

35

Aug. 29, 2008, no pet. h.) (Henson, J., dissenting). Her single-minded focus on the underlying appeal ignores both the basis of the motion to recuse and the elements of the standard to apply. Justice Henson asserts that recusal is warranted in this case, at least partly, because the panel in the underlying case analyzed the issues differently than she would have.[16] She asserts that because of the result the panel reached, there is reason to doubt "whether the case was heard by an impartial tribunal." Under her logic, the entire panel has exhibited grounds for recusal—an accusation far beyond the motion to recuse in both its premise and scope.

From the moment the opinion in the underlying case was scheduled to be released, Justice Henson has shown an extraordinary interest in the outcome of that appeal. In the two years that she has served as a justice on this Court, Justice Henson has only chosen to ask this Court to consider an appeal en banc on one occasion: after learning that the underlying opinion in this case, which she disagreed with, was going to be released. Even though no party had asked for en banc consideration at the time, Justice Henson, who was not on the Court when the panel heard oral argument in the underlying case, engaged in the exceptionally rare task of asking a court to sua sponte hear an appeal en banc before the panel had released its opinion and then took the even more unusual step of dissenting to this Court's denial of that request.[17] Justice Henson's stated reasoning was her concern with the length of time between the submission of the cases and the preparation of the opinion. *See Ex parte Ellis*, No. 03-05-00585-CR, 2008 Tex. App. LEXIS 7831, *3

---

[16] This observation is confirmed by her statement that one of the elements compelling her vote to recuse Justice Waldrop is the panel's "tortured application of the reasonable person standard" in the opinion in the underlying case.

[17] In the eight years that the author of this opinion has been a member of this Court, no justice, in the absence of some procedural irregularity, has sua sponte requested that a case be considered en banc and certainly has not written a dissenting opinion to a Court vote denying that request.

36

(Tex. App.—Austin Aug. 29, 2008, no pet. h.) (Henson, J., dissenting). However, the case had been pending during her entire 20-month tenure on this Court and en banc consideration at that junction would have served only to delay disposition. In light of the fact that the case had been decided and was set to be disposed of, her claim that the lengthy delay motivated her to act in that case is, at best, perplexing. If her true concern is participating in cases of perceived importance, certainly there have been many others to chose from at this Court. Nevertheless, Justice Henson has gone to these extraordinary lengths to advance her views regarding the underlying appeal, even in the context of a recusal motion in which those issues are not raised and are not relevant.

Whatever the events surrounding the resolution of the motion to recuse and the underlying appeal may show, it is certainly not bias or partiality on behalf of Justice Waldrop.

## CONCLUSION

For all the reasons previously given, we deny the State's motion to recuse.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson, Puryear, Pemberton and Henson;
   Dissenting Opinion by Justice Patterson;
   Dissenting Opinion by Justice Henson

Denied

Filed: December 31, 2008

Publish

37